IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 7, 2010

**CHRISTOPHER PERRY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 03-08489    James M. Lammey, Judge**

**No. W2009-02432-CCA-R3-PC  - Filed January 26, 2011**

The petitioner, Christopher Perry, appeals the denial of his petition for post-conviction relief from his first degree murder conviction, arguing that his trial counsel provided ineffective assistance by his failure to properly investigate the case and advise him about testifying at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

R. Todd Mosley (on appeal) and Susan Bjorklund (at hearing), Memphis, Tennessee, for the appellant, Christopher Perry.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kevin Rardin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree murder by a Shelby County Criminal Court jury and sentenced to life imprisonment.  On his first direct appeal, this court concluded that the evidence was sufficient to sustain his conviction but determined that the trial court had not properly entered findings regarding the petitioner's Sixth Amendment claims in his motion to suppress.  See State v. Christopher Perry, No. W2004-03004-CCA-R3-CD, 2005 WL 3533338, at *1 (Tenn. Crim. App. Dec. 22, 2005). This court, thus, vacated the denial of the petitioner's motion to suppress and remanded to

the trial court for further proceedings. See id. After further proceedings in the trial court, the petitioner appealed again. This court affirmed the judgment of the trial court, and the Tennessee Supreme Court denied permission to appeal. See State v. Christopher Perry, No. W2006-01935-CCA-R3-CD, 2007 WL 2822922, at *5 (Tenn. Crim. App. Sept. 28, 2007), perm. to appeal denied (Tenn. Feb. 4, 2008).

During the petitioner's first direct appeal, this court recounted the proof adduced at trial as follows:

On the night of July 29, 2003, in the aftermath of a storm which downed power lines and caused a blackout in Shelby County for several days, the [petitioner] stopped at his aunt's house at 1160 James Street in Memphis to check on his mother. After entering the house for a short time, the [petitioner] returned to the front porch and noticed that the hood of his red and white 1982 Dodge truck was up and that someone was under the hood. The [petitioner] ran toward the victim, whom he did not know, hitting the victim with a plastic porch chair. The victim, Stanley Johnson, attempted to flee; however, the [petitioner] chased after him and upon catching the victim, the two "tussl[ed] for a while[,] and then they let each other go." The victim attempted to explain to the [petitioner] that he was not trying to steal the truck's radio, rather he was only checking to see if the radio worked. Wires, however, could be observed hanging from the space which had housed a radio. The [petitioner], whose demeanor was described as "fired-up, mad, angry," told the victim that he was "a walking dead man." The [petitioner] then got into a white Dodge truck and drove to his mother's house on Castilia Street, where he also resided.

Upon reaching his mother's house, the [petitioner] found his brother, his girlfriend, and several friends present, as the residence was in one of the few areas of Memphis that still had electricity. Those present described the [petitioner] as acting "wild, crazy, and just losing his mind," as he explained to the group that he had caught someone stealing the radio from his truck. The [petitioner] was overheard stating that "he was going to finish the boy off." He then secured a 9 mm pistol from his room and asked his girlfriend, Danielle Hardin, to accompany him as he returned to the James Street address to return his mother home.

As the [petitioner] was approaching James Street, he noticed a person on the street and stopped his truck. Although the street lights provided no illumination, the [petitioner] recognized the person as the man who had earlier

stolen the truck radio. As the man reached for an object tucked beneath his arm, the [petitioner] ran toward the man with his pistol, firing as he ran. The victim collapsed to the ground. The [petitioner] ran back to his truck and quickly left the scene. He then drove to the home of his friend Brian Turner, where he asked to leave the gun to avoid getting "a weapons charge." The [petitioner] explained to Turner that someone had attempted to break into his truck and that he had been in a fight and had fired the gun.

The following day Turner learned that a shooting had occurred the previous night, and he returned the gun to the [petitioner]'s home, placing it in a boat near the back door. Shortly thereafter, the pistol was found in the boat by a family member, and several of the [petitioner]'s friends disposed of the weapon in Martin Luther King Park in a location near the Mississippi River.

On July 29th, Darren Boyce with the Crime Scene Department of the Memphis Police was called to the crime scene and found the victim's body in the middle of James Street on his stomach with his hands to the side. Four 9 mm shell casings were also found at the scene. On July 31st, Officer Frank Sousoulas with the Memphis Police Department was directed to Martin Luther King Park where he recovered a 9 mm Beretta semiautomatic on an embankment sloping toward the Mississippi River. Shelby County Medical Examiner, Doctor O.C. Smith, who performed an autopsy on the victim, testified that the victim died from a gunshot wound to the back of the head.

On July 30, 2003, the [petitioner]'s mother advised her son to report to the police department, at which time the [petitioner] gave a statement to Memphis Police Officer James Howell. The [petitioner] was Mirandized and signed an advice of rights form. In this statement the [petitioner] denied any responsibility for the victim's death or possessing a firearm.

While at the dentist's office recovering from three root canals on August 4, 2003, the [petitioner] was arrested for the murder of Stanley Johnson. He was again informed of his Miranda rights. On this date, the [petitioner] gave a statement to Sergeant Sims of the homicide bureau admitting that he did shoot the victim with a 9 mm pistol; however, he claimed that the shooting was accidental.

Christopher Perry, 2005 WL 3533338, at *1-2 (footnote omitted).

In November 2008, the petitioner filed a *pro se* petition for post-conviction relief, in which he raised, among other things, various claims of ineffective assistance of counsel, and an amended petition was filed following the appointment of post-conviction counsel. The post-conviction court conducted an evidentiary hearing on July 2, 2009. At the hearing, the petitioner's trial counsel testified that he was retained to represent the petitioner by either the petitioner or a member of his family. The petitioner had been represented by other counsel prior to him who had filed various motions, but counsel recalled filing a motion to suppress the petitioner's statement and having a hearing on that motion. He said that the motion was denied.

Counsel testified that he contacted the petitioner's dentist in preparation for trial to confirm that the petitioner had been at her office the day he was arrested and had been given anesthetics for having work done on his teeth. Counsel explained that part of the basis for the motion to suppress was that the petitioner "was incapable based on the anesthesia that he had received earlier that day to make that choice and sign that waiver. And then the second part was just right to counsel."

Counsel stated that also in preparation for trial, he contacted and interviewed witnesses as well as visited the crime scene several times, "one time at 12 or one o'clock in the morning to see what the lighting was like at that particular place at the time that the shooting had occurred." He was able to "interview[] a couple of people that were on the streets at that particular time." One difficultly he encountered was that on the actual night of the shooting, the electricity was out because of "that big storm," making it difficult "to get a feel for exactly what the lighting may have been on that street" at the time of the shooting.

Counsel explained that the main issue in the case was whether the shooting was premeditated, meaning that his preparation for trial primarily concerned determining whether the State could prove a premeditated homicide "as opposed to [interviewing] witnesses who may have been able to shed some light on whether [the petitioner] was actually at the scene or not because that was never an issue." Counsel said that he and the petitioner had several discussions regarding whether he should testify, and the petitioner ultimately decided that he wanted to testify. Counsel's "biggest concern was that . . . the whole basis of our case was based on whether or not [the petitioner] would come across as heated." He said that was his major concern about cross-examination, and he discussed that with the petitioner "pretty extensively."

On cross-examination, counsel testified that he attempted to combat the State's proof of premeditation by arguing that the petitioner had returned to the street where his mother lived out of "concern for his mother" due to the dangers of her neighborhood, not because

he was searching for the victim. Counsel said that they also tried to present a self-defense argument based on the earlier altercation where the petitioner had caught the victim breaking into his truck. They further tried to prove that because of the poor lighting that night, the petitioner was unable to tell whether the victim was armed during their second encounter.

Counsel stated that he questioned the petitioner at trial concerning his mental state and emotions at the time of the shooting because those factors were important to their defense in that they "were trying to prove that his mental state and his emotions at that particular time had more to do with the concern for his mother and she being in that neighborhood as opposed to going back there to search for the victim."

The petitioner testified that his mother hired counsel to be his attorney approximately three weeks before his first trial date. Before trial, he met with counsel three or four times in person and had several phone conversations with him. He said that counsel relayed to him that there were certain witnesses he could not get in contact with "because of lack of addresses or phone numbers," but he was able to contact two or three of the witnesses.

The petitioner stated that he knew the definition of cross-examination, and counsel "kind of broke it down to [him] a little." Counsel told him to listen to the prosecutor's questions very carefully because the prosecutor "would try and confuse [him]." Concerning his decision to testify, the petitioner recalled that counsel's "exact words were it would be best in my behalf if I [testified] because . . . it was basically I had to win this thing myself." The petitioner believed that counsel's recommendation was for him to testify.

On cross-examination, the petitioner acknowledged that counsel filed a motion to suppress his statement and argued for suppression at a hearing before the judge. He agreed that counsel met with him at least three or four times before trial and had several phone conversations with him in addition to their meetings. He acknowledged that counsel discussed his investigation and preparation for trial, which included going over a list of potential witnesses. Even though counsel was unable to interview all of the witnesses due to a lack of contact information, he did interview some of them.

The petitioner testified that at the time of trial, he was twenty years old and had completed the eleventh grade. He had been to court before on "traffic tickets" and "one assault charge." Asked about his discussions with counsel concerning whether he should testify, the petitioner said that "[b]asically, it was more of a letting me know, trying to get me to understand that my best interest [wa]s for me to testify. . . . That was the bottom line." He acknowledged that counsel explained to him that if he testified, the prosecutor would be allowed to ask him questions.

-5-

On redirect examination, the petitioner admitted that he had several state-appointed attorneys prior to retaining counsel. He explained that he made the decision to retain counsel because "I've always known or been led to know that private representation is always better." He thought that a retained attorney "ha[d] the time to deal with you personally. They're able to prepare for a lot of things more than what the public defender was because they have so many cases and so many things."

The petitioner testified that counsel let him know "basically . . . what he would be able to do and what he wouldn't be able to do due to the time period." He claimed that counsel was unable to accomplish things "due to the time period, the lack of finances and how we were being rushed for trial."

On examination by the court, the petitioner admitted that his understanding of what an alibi witness was may have been faulty because he was admittedly at the scene. He explained that he thought that counsel should have inquired "[i]nto the other individuals that were there." Asked about other complaints he had with counsel's representation, the petitioner said that a witness at trial testified that she saw the petitioner "right there" at the scene when, in actuality, she was "down the street toward the other end." He also complained that some of the State's witnesses testified to certain things as first-hand information, when in actuality they received their information from other individuals.

The petitioner stated that he felt that the investigation conducted by counsel was "poor" because "he didn't have any help." The petitioner saw the four pictures counsel took of the street, and counsel "let [him] know that he went out there one day . . . and walked the street[.]" However, counsel told him that there were a lot of things that he wanted to do but was unable due to the time constraint. The petitioner felt that the outcome of his case would have been different had counsel been able to do "those things . . . far as the investigation."

The petitioner was also dissatisfied with counsel's cross-examination of the witnesses and the way his statement was obtained by the authorities. He said that he had other complaints concerning things he felt were not carried out properly, but he did not have his list with him.

The post-conviction court found, with regard to the issues relevant on appeal, that part of counsel's preparation for trial included visiting the scene on several occasions – one time at one o'clock in the morning in an attempt to ascertain the lighting conditions at the time of the shooting. The court stated that counsel conducted his own investigation, "but the investigations had already been performed by others up until that point as well." The court observed that counsel "did everything he could to mitigate or even attempt to acquit [the petitioner]. He attempted to elicit testimony. And the only way he could really would

be to have [the petitioner] testify that he thought the other individual had a gun[.]"

In its subsequent written order denying post-conviction relief, the court elaborated on its oral findings that the petitioner admitted at the evidentiary hearing that counsel "did investigate the case and communicated with [the petitioner] regarding the investigation." The court, implicitly accrediting counsel's testimony, recalled that counsel testified that he had contacted witnesses, visited the scene at the same time that the shooting occurred, and "'interviewed a couple of people that were on the streets at that particular time.'" The court concluded that counsel was not ineffective in his investigation of the petitioner's case. With regard to the petitioner's allegation that trial counsel failed to inform him adequately concerning his right to testify as well as prepare him to testify, the court accredited counsel's testimony that he discussed those matters with the petitioner several times. The court additionally observed that the petitioner was voir dired by the trial court concerning his right to testify or to not testify. The court concluded that counsel rendered effective assistance in informing the petitioner regarding his right to testify and preparing him to testify.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner alleges that counsel rendered ineffective assistance because counsel failed to properly investigate his case. However, counsel's testimony, as accredited by the post-conviction court, showed that counsel visited the crime scene on several occasions and interviewed some witnesses who were "on the streets at that particular time." Counsel also attempted to contact other witnesses but was unable due to incorrect contact information. The petitioner asserts that as part of his investigation, counsel should have had the street lights turned off when he surveyed the crime scene so he could properly convey the lighting conditions at the crime scene to the jury. The petitioner asserts that this would have allowed counsel to show that "the victim's death could not have been premeditated due to the lighting at the scene." The petitioner, however, failed to present any proof that having the city streets lights turned off was deficient performance or even possible, and how exactly that would have allowed him to show that the shooting was not premeditated. The petitioner has failed to show that counsel performed deficiently or that any deficiency caused him prejudice.

The petitioner also alleges that counsel rendered ineffective assistance in his failure to properly advise him about testifying at trial. He asserts that counsel's "advice consisted of convincing [the] [p]etitioner that it was in his best interest to testify." The petitioner claims that he was prejudiced by counsel's lack of advice as evidenced by his "repeatedly

-8-

giving compound and explanatory answers while on cross-examination." However, counsel testified that he had several discussions with the petitioner concerning the reasons why he should or should not testify. The petitioner, himself, admitted that counsel discussed that testifying would subject him to cross-examination by the State and that he needed to listen to the prosecutor's questions very carefully. Counsel testified that he was concerned that the petitioner might "come across as heated" during cross-examination and discussed that with the petitioner. The petitioner has failed to show by clear and convincing evidence that counsel rendered deficient performance in informing him of his right to testify and preparing him for such.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.


_____
ALAN E. GLENN, JUDGE